# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

PRENTICE D. MARSHALL, JR.,

                         Petitioner,

v.

BRIAN WILLIAMS,[1] et al.,

                        Respondents.

Case No. 2:21-cv-02046-APG-BNW

**Order Denying
28 U.S.C. § 2254
Amended Petition**

**[ECF No. 17]**

Petitioner Prentice D. Marshall, Jr. has filed a counseled amended petition for writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 17. The remaining grounds[2] in the amended petition challenge the trial court's denial of Marshall's pretrial motion to suppress and his counsel's failure to argue the principles recognized in *Missouri v. Seibert*, 542 U.S. 600 (2004). For the reasons discussed below, I deny the amended petition and a certificate of appealability.

## I.    BACKGROUND

### A.    Factual background from grand jury proceeding[3]

On November 18, 2009, around 11:15 p.m., Evon Eby was returning home when a black car stopped near him. ECF No. 20-1 at 27–28. A man exited the car carrying a gun, told Eby to give him all his belongings and to get on the ground, and pointed the gun at Eby while he

---

[1] The state corrections department's inmate locator page states that Marshall is incarcerated at High Desert State Prison. Brian Williams is the current warden for that facility. At the end of this order, I direct the clerk to substitute Brian Williams as a respondent in place of Calvin Johnson. *See* Fed. R. Civ. P. 25(d).

[2] I previously dismissed ground 3(b). ECF No. 63.

[3] I make no credibility findings or other factual findings regarding the truth or falsity of this evidence from the grand jury proceeding. My summary is merely a backdrop to my consideration of the issues presented in the amended petition.

collected Eby's backpack, pack of cigarettes, and iPod. *Id*. at 28. The man then told Eby that he was "lucky [he] didn't shoot" him and left. *Id*. at 28, 30.

Later that night, after midnight on November 19, 2009, Adrian Pena was driving the car, Marshall was in the front passenger seat, and Quadrae Scott and Saul Williams were in the backseats. *Id*. at 51, 58. These men were either members or associates of the Wood gang. ECF No. 20-2 at 11. They saw Trevor Nettleton, an off-duty police officer, in a garage, and after parking the car a few houses away, two of the men exited the car with guns. ECF No. 20-1 at 51. After attempting to rob Nettleton, a confrontation broke out, resulting in Marshall being shot twice and Nettleton being fatally shot in the chest. *Id*. at 6–7, 9–10, 60; *see also* ECF No. 20-2 at 4–5.

After running to a nearby house, Marshall called his sister to ask for a ride to the hospital. ECF No. 20-2 at 30–31. Marshall told his sister that he had been robbed as he was getting off a bus. *Id*. at 31. While in the hospital, Marshall told detectives the same story he had told his sister. *Id*. at 42. However, after the detectives falsely told Marshall that Williams had already named Marshall as a suspect in the Nettleton murder, Marshall eventually admitted that he had lied. *Id*. Marshall told the detectives that he was involved in the attempted robbery and murder of Nettleton, admitting that he was the one who shot Nettleton and explaining that he had committed the crime with Williams "to show that he was hard" to the Wood gang. *Id*. at 42–43.

## B. Procedural background

Marshall, along with his co-defendants, were indicted on the following crimes: conspiracy to commit robbery with the intent to promote, further or assist a criminal gang; robbery with the use of a deadly weapon and with the intent to promote, further or assist a criminal gang; burglary while in possession of a firearm and with the intent to promote, further

or assist a criminal gang; attempted robbery with the use of a deadly weapon and with the intent to promote, further or assist a criminal gang; murder with the use of a deadly weapon and with the intent to promote, further or assist a criminal gang; conspiracy to commit an act for the perversion or corruption of public justice or the due administration of law with the intent to promote, further to assist a criminal gang; and accessory to murder with the intent to promote, further or assist a criminal gang. ECF No. 20-3.  The prosecution filed a notice of intent to seek the death penalty as to Marshall and Williams. ECF No. 22-7.

After pleading not guilty, Marshall filed a motion to suppress his statements, arguing that (1) his statements to detectives "must be suppressed as he was in custody, interrogated and not read his Miranda rights prior to his first interview on November 20, 2009," (2) the "statements obtained from him were the result of coercion," and (3) "all purported confessions after the initial interrogation by the detectives must be excluded as fruits of the poisonous tree." ECF No. 25-6.  An evidentiary hearing was held on Marshall's motion. ECF No. 40-5.  The trial court denied the motion in part, finding that Marshall's statements made to detectives while in the hospital were admissible. *Id.* at 68–70.

Marshall agreed to plead guilty to robbery with the use of a deadly weapon, grand larceny, two counts of conspiracy to commit robbery with the intent to promote or assist a criminal gang, robbery with the use of a deadly weapon with the intent to promote or assist a criminal gang, burglary while in possession of a firearm with the intent to promote or assist a criminal gang, attempted robbery with the use of a deadly weapon with the intent to promote or assist a criminal gang, and murder with the use of a deadly weapon with the intent to promote or assist a criminal gang. ECF No. 48-1.  In return for Marshall's guilty plea, (1) the prosecutor agreed to withdraw the notice of intent to seek the death penalty, (2) the parties stipulated to a

sentence of life without the possibility of parole, and (3) the parties agreed that Marshall "maintain[ed] his right to appeal the limited issue of the denial of his motion to suppress statements 1 and 2" with the understanding that if Marshall "is successful on appeal or other post-conviction relief, the notice of intent to seek the death penalty will be reinstated." ECF No. 48-1.  Marshall was sentenced to, among other things, life without the possibility of parole, and the judgment of conviction was entered on August 13, 2015. ECF No. 48-9.  Marshall appealed, and the Nevada Court of Appeals affirmed on March 29, 2017. ECF No. 49-9.  Remittitur issued on April 24, 2017. ECF No. 49-11.

Marshall filed a *pro se* state petition for post-conviction relief and a counseled supplemental petition on April 24, 2018, and April 27, 2020, respectively. ECF Nos. 49-12, 49-27.  The state district court denied Marshall's petition on November 24, 2020 without holding an evidentiary hearing. ECF No. 50-6.  Marshall appealed, and the Nevada Court of Appeals affirmed on September 17, 2021. ECF No. 51-8.  Remittitur issued on October 12, 2021. ECF No. 51-10.

Marshall transmitted his *pro se* federal petition for a writ of habeas corpus under 28 U.S.C. § 2254 on November 15, 2021. ECF No. 1-1.  I appointed counsel for Marshall, and counsel filed an amended petition on August 30, 2022. ECF Nos. 15, 17.  The respondents moved to dismiss Marshall's amended petition, which I granted in part, finding that ground 3(b) was unexhausted. ECF No. 60.  Marshall filed a declaration abandoning ground 3(b), so I dismissed that ground. ECF No. 63.  The respondents filed an answer to the remaining grounds in the amended petition on July 26, 2023, and Marshall replied on August 28, 2023. ECF Nos. 68, 69.

/ / / /

## II.     GOVERNING STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act (AEDPA) sets forth the standard of review generally applicable in habeas corpus cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  A state court decision is contrary to clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254 "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).  A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413).  "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous.  The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## III. DISCUSSION

### A. Ground 1—Marshall's custody status

In ground 1, Marshall alleges that the state court's finding that he was not in custody when questioned by police officers in the hospital was an unreasonable determination of fact. ECF No. 17 at 7. Specifically, Marshall alleges that under the totality of the circumstances, no reasonable person would have concluded that the police would stop their questioning if asked to leave because (1) the police made it clear that they did not believe Marshall when he told them that he was a victim of a robbery, (2) he was separated from his family while in the hospital, (3) he had been tested for gunshot residue, and (4) he was being monitored by a police officer either inside or outside his hospital room. *Id*. at 21–27.

#### 1. Background information

During a pre-trial evidentiary hearing, police officer Chastity Smith testified that on November 19, 2009, around 1:00 a.m., she responded to the North Vista Hospital regarding a victim who had been robbed and shot. ECF No. 36-4 at 33. Officer Smith contacted Marshall in

1  the emergency portion of the hospital. *Id*. at 34.  After Officer Smith identified herself, Marshall

2  "advised he had been shot, that he was walking home when suspects came up to him and they

3  had . . . robbed him and then shot him." *Id*. at 36.  During Officer Smith's 30-to-40-minute

4  discussion with Marshall, Marshall was being treated by hospital staff, but he never lost

5  consciousness or appeared to not be lucid.[4] *Id*. at 36–37.  Marshall was then transported by

6  ambulance to University Medical Center (UMC) due to the severity of his injuries, and Officer

7  Smith followed the ambulance in her patrol vehicle. *Id*. at 38.  Although Officer Smith did not

8  have further discussions with Marshall, she stayed at UMC waiting outside Marshall's hospital

9  door, including while Marshall was interviewed by detectives, until another officer arrived later

10  to relieve her at the end of her shift. *Id*. at 40.

11      During the same pre-trial evidentiary hearing, Detective Mark Suranowitz testified that

12  he and his partner Detective Alan Antoniewicz arrived at UMC to talk to Marshall on November

13  19, 2009 at around 5:00 a.m. *Id*. at 61–62.  The detectives first spoke with a nurse about

14  Marshall's condition, and they were advised that Marshall had a half dose of morphine but that

15  Marshall "was coherent and he would understand everything that [they] said and he would be

16  able to talk to [them] fine." *Id*. at 65–66.  The detectives then entered Marshall's hospital room

17  and identified themselves. *Id*. at 66.  Detective Suranowitz testified that Marshall "was clear . . .

18  when he spoke, and he was alert, and he was able to talk fine." *Id*. at 70.

19

---

20  [4] Wendy Radke, a crime scene analyst, was also dispatched to the hospital. *See* ECF No. 17-1 at
41.  In her report, Radke stated, "I was contacted . . . by NLVPD crime scene investigator (CSI)

21  Marks P#1726, who was investigating a homicide scene at another location. CSI Marks
requested I respond to North Vista Hospital immediately . . . to collect a gunshot residue kit from

22  a patient in the emergency room." *Id*.

23  Members of Marshall's family were also present at the hospital. *See* ECF No. 17-1 at 68.
However, they report that they "were told by police officers that [they] could not meet with
[Marshall], and were directed to a waiting room." *Id*.

Initially, Marshall told the detectives that he was the victim of a robbery. *Id*. at 71.  The detectives "advised [Marshall] that he did not have to talk to [them], that he could tell [them] to leave the room, and anything he said was voluntary." *Id*.  Marshall stated he understood. *Id*.  Then, "about 15 minutes into th[e] conversation[, the detectives] told him [they] d[id] not think his story was true." *Id*.  Marshall then "admitted to being involved in the attempted robbery of . . . Trevor Nettleton . . . and he admitted to firing shots at Trevor Nettleton." *Id*.  At that point, the detectives had been speaking to Marshall for approximately 50 minutes. *Id*.  The detectives then left the room. *Id*. at 73.

About ten minutes later, Detectives Suranowitz and Antoniewicz were "informed by a nurse that Mr. Marshall had wanted to speak to [them] again, and at that time [they] went back" to Marshall's hospital room. *Id*.  Before speaking with Marshall, Detective Antoniewicz advised Marshall of "his rights per Miranda." *Id*. at 74.  Marshall indicated that he understood his *Miranda* rights. *Id*. at 75.  Marshall then "once again . . . admitted to doing the shooting, and he wanted to know what his consequences were." *Id*. at 74.  Marshall gave "basically the same information he had said the first time." *Id*. at 75.  This second interview lasted about eight minutes. *Id*.  After the second interview, the detectives told Marshall that he was under arrest, and they placed a hold on Marshall by making "sure there was an officer that would remain at the hospital" because "Marshall was not free to leave at that point." *Id*. at 76.

A few weeks later, Detectives Suranowitz and Antoniewicz interviewed Marshall a third time. *Id*.  This interview occurred in an interview room at the North Las Vegas Detention Center regarding the Eby robbery. *Id*. at 76–77.  At the beginning of the interview Marshall commented, "I can talk to my attorney, right?" ECF No. 37-1 at 62.  Detective Suranowitz did not understand this comment to be an invocation of Marshall's right to speak to counsel. *Id*. at 62.  Rather,

Detective Suranowitz understood this comment to be seeking clarification because a correctional officer at the North Las Vegas Detention Center had told Marshall that his meeting was with an attorney, not with detectives, because the correctional officer wanted to maintain Marshall's security and privacy. *Id*. at 42–43.

The trial court granted, in part, and denied, in part, Marshall's motion to suppress. ECF No. 40-5 at 69-70.  The trial court determined that Marshall was not in custody when he made his first and second statements at UMC, so it denied Marshall's motion to suppress those statements. *Id.* at 69.  However, the trial court determined that Marshall made a clear, unambiguous, and unequivocal request for counsel at the detention center, so it granted Marshall's motion to suppress his third statement. *Id.* at 69–70.

### 2.    Legal standard

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Custodial interrogation "mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*.  "[T]he ultimate inquiry" of whether someone is in custody "is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted).  There are "[t]wo discrete inquiries" to determine whether an individual is in custody: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

Relevant factors in ascertaining how an individual would assess his freedom of movement "include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal citations omitted).  The "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994).

### 3.     State court determination

In affirming Marshall's judgment of conviction, the Nevada Court of Appeals held:

> Although acknowledging he was at a hospital, which is not typically an area controlled by police, Marshall asserts he was in custody for *Miranda* purposes because the police controlled the area around him, the police had already identified him as a suspect in the Nettleton shooting when they interviewed him, multiple indicia of arrest were present during the first interview with detectives, and the questioning of him was exhaustive and focused on his involvement in the Nettleton shooting.
>
> "The Fifth Amendment privilege against self-incrimination provides that a suspect's statements made during custodial interrogation are inadmissible at trial unless the police first provide a *Miranda* warning." *State v. Taylor*, 114 Nev. 1071, 1081, 968 P.2d 315, 323 (1998). "'Custody' for *Miranda* purposes means a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Rosky*, 121 Nev. at 191, 111 P.3d at 695. Because Marshall was not formally arrested when he was first interviewed by the detectives, "the pertinent inquiry is whether a reasonable person in the suspect's position would feel 'at liberty to terminate the interrogation and leave.'" *Id*. (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). This court considers the totality of the circumstances when deciding whether a person was in custody. *Alward v. State*, 112 Nev. 141, 154, 912 P.2d 243, 252 (1996), *overruled on other grounds by Rosky*, 121 Nev. 184, 111 P.3d 690.
>
> The district court determined Marshall was not in custody for *Miranda* purposes, and we agree. Marshall voluntarily took himself to North Vista Hospital for treatment of gunshot wounds. Because Marshall had reported he had been robbed and shot, a single

police officer in full uniform was dispatched to the hospital to take Marshall's statement. The police officer spoke with Marshall for approximately 40 minutes while medical staff worked on Marshall. Shortly after the police officer concluded her conversation with Marshall a crime scene analyst arrived at the hospital to process Marshall for possible evidence.

Due to the severity of his wounds, Marshall was transported by ambulance to University Medical Center (UMC), where he was admitted at 4:30 a.m. At the direction of her sergeant, the police officer followed in her patrol vehicle. Once at UMC, the police officer stayed nearby Marshall, sometimes inside his room and sometimes outside of his room, waiting for detectives to arrive so she could pass information on to them. Medical staff continued to interact with Marshall and Marshall's movements in the hospital were directed by the medical staff. Detectives Mark Suranowitz and Alan Antoniewicz arrived at UMC in the 5 a.m. hour, and after his arrival, the police officer had no further interaction with Marshall and waited outside of Marshall's room.

Upon their arrival at UMC, the detectives asked a nurse what Marshall's condition was, what medications he was on, and whether he would be able to communicate in a coherent manner and understand what was going on. The nurse informed them Marshall had been given a half dose of morphine, he was coherent and would be able to talk to them and understand everything. Detective Suranowitz testified that, although Marshall was a suspect in the Nettleton shooting, at that time there was no police hold placed on Marshall and he would have been free to leave because they did not have probable cause to arrest him.

The detectives, who were in plain clothes, introduced themselves to Marshall and explained they wanted to talk to him to find out what happened. Marshall initially told the detectives he was walking home from a bus stop when a couple of guys approached him and asked for all of his stuff. During the interview, the detectives told Marshall they were trying to figure out what happened, they had talked to people and the stories were not matching up, they did not believe Marshall was being totally honest with them, and this was his one chance to be honest with them. The detectives told Marshall he did not have to talk to them if he did not want to and he could tell them to leave and they would leave.

Marshall continued to talk to the detectives. It was only after the detectives questioned Marshall's veracity, and Marshall informed them he left out part of the story, that the detectives questioned Marshall about facts related to the Nettleton shooting. The form of the questions, however, was not leading as the detectives did not put any words in Marshall's mouth; instead the detectives asked Marshall to tell them how things happened, why

things started, where things happened, what Marshall did, and what other people did.

Ultimately Marshall confessed to activities which implicated him in the Nettleton shooting. The detectives then concluded the interview and left the room. The interview lasted approximately 50 minutes and, during the interview, medical personnel came in and out of the room, but no one other than medical personnel entered the room.

Approximately 10 minutes after the first interview, a nurse informed the detectives Marshall wanted to speak with them again. The detectives returned to Marshall's room and, before questioning him, they informed him he was under arrest and advised him of his *Miranda* rights. He stated he understood and agreed to speak with them. This second interview lasted approximately 8 minutes. After the conclusion of the second interview a police hold was placed on Marshall with the hospital. Marshall was not placed in handcuffs or restraints and he remained in the same room and bed; however, an officer remained at the hospital with him and he was not free to leave at that point. A notation was added to the UMC Interdisciplinary Progress Notes at 6:45 a.m. stating it was explained to Marshall he was on a police hold at that point.

Detective Suranowitz testified at the evidentiary hearing on the motion to suppress that he was never aware that Marshall's friends or family members were there to see Marshall, he was not aware an attorney called to talk to Marshall,

> [FN3] Even if the detectives were aware of an attorney's attempts to reach Marshall, they were not required to inform Marshall of the attorney's attempts to contact him or to update Marshall on the status of his legal representation, and their failure to do so has no bearing on whether Marshall was in custody for *Miranda* purposes. *See Moran v. Burbine*, 475 U.S. 412, 426-427 (1986). Marshall points out several States have departed from *Moran* and have held the police are required to inform a defendant when they are aware counsel is attempting to reach the defendant and he urges this court to also depart from *Moran* in this regard. We need not address this issue because the only evidence in the record regarding this matter is that the

detectives were not aware counsel
was attempting to reach Marshall.

He was not aware of anyone being denied access to Marshall prior to the first interview, and, prior to the first interview, he never denied anyone access to Marshall.

The district court found that although Marshall may not have been free to leave and he may not have been able to move about freely, this was because he was in the hospital being treated for his wounds. This finding is supported by the record. Objectively considering the totality of the circumstances, we conclude a reasonable person in Marshall's position would have felt at liberty to terminate the interview and request the officers to leave. Therefore, we conclude Marshall was not in custody for *Miranda* purposes when the detectives first interviewed him and *Miranda* warnings were unnecessary. *See Alward* at 155, 912 P.2d at 252 (identifying four factors to be considered when making the objective custody determination); *Taylor*, 114 Nev. at 1082 n.1, 968 P.2d 323 n.1 (identifying several objective indicia of arrest); *see also Commonwealth v. McGrail*, 952 N.E.2d 969, 976 (Ct. App. Mass 2011) (holding the questioning of a person in a hospital, where the person "was in an unsecured area, surrounded by the general public and various medical professionals," was noncustodial because "[a] reasonable person would have understood that he was being held at the hospital by medical personnel for medical purposes, in light of the potential severity of his injuries").

ECF No. 49-9 at 3–8.

### 4.    Analysis

The Nevada Court of Appeals reasonably agreed with the trial court in determining that Marshall was not in custody for *Miranda* purposes during the detectives' first interview.  It is true that (1) Officer Smith stayed near Marshall's hospital room before and during Marshall's first interview with detectives and (2) Marshall had been tested for gunshot residue before his first interview with detectives.  These circumstances are certainly relevant to a custody determination.[5] *Cf. United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1985) ("If the police

---

[5] The fact that the detectives lied to Marshall is not relevant to a custody determination. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (explaining that "whatever relevance [the officer's false statement about having discovered Mathiason's fingerprints at the scene] may

13

took a criminal suspect to the hospital from the scene of a crime, monitored the patient's stay,

stationed themselves outside the door, arranged an extended treatment schedule with the doctors,

or some combination of these, law enforcement restraint amounting to custody could result.").

However, as the Nevada Court of Appeals reasonably determined, looking at the sum of the

objective circumstances of the interview, a reasonable person would have felt at liberty to

terminate the interview. *See Thompson*, 516 U.S. at 112; *see also Yarborough v. Alvarado*, 541

U.S. 652, 665 (2004) ("The custody test is general, and the state court's application of our law

fits within the matrix of our prior decisions.").  Indeed, as the court reasonably noted, Marshall

voluntarily took himself to the hospital, Marshall's movements were directed and restricted only

by medical staff, the detectives inquired about Marshall's condition before speaking with him to

make sure he would be coherent, and, most importantly, the detectives clearly advised Marshall

that he did not have to speak with them, he could tell them to leave his hospital room, and any

discussion they had was voluntary.

Accordingly, the Nevada Court of Appeals' affirmation of the trial court's denial of

Marshall's suppression motion regarding his custody status during the detectives' first interview

was neither contrary to, nor an unreasonable application of, clearly established federal law and

was not based on an unreasonable determination of the facts.  Marshall is not entitled to federal

habeas relief for ground 1.

**B.     Ground 2—voluntariness of Marshall's waiver**

In ground 2, Marshall alleges that the state court's determination that his statements to

police were "voluntary" was an unreasonable determination of fact and contrary to or an

have to other issues in the case, it has nothing to do with whether respondent was in custody for
purposes of the *Miranda* rule.").

14

1   unreasonable application of federal law because his decision to speak with detectives was not a

2   product of rational choice but rather was a result of skillful psychological manipulation and

3   coercion. ECF No. 17 at 9.

4         **1.**     **Legal standard**

5        A "defendant may waive effectuation of [his or her] rights, provided the waiver is made

6   voluntarily, knowingly, and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  A

7   determination whether an accused's "statements obtained during custodial interrogation are

8   admissible" is "made upon an inquiry into the totality of the circumstances surrounding the

9   interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to

10   forgo his rights to remain silent and to have assistance of counsel." *Fare v. Michael C.*, 442 U.S.

11   707, 724–25 (1979).  This waiver inquiry has two dimensions: the waiver must be "voluntary in

12   the sense that it was the product of a free and deliberate choice rather than intimidation, coercion,

13   or deception," and the waiver must be "made with a full awareness of both the nature of the right

14   being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475

15   U.S. 412, 421 (1986); *see also Dickerson v. United States*, 530 U.S. 428, 434 (2000) (explaining

16   that the totality of the circumstances includes "both the characteristics of the accused and the

17   details of the interrogation"); *Withrow v. Williams*, 507 U.S. 680, 693–94 (1993) (explaining that

18   the following are potential factors to look at in determining whether a confession was voluntary:

19   the element of police coercion; the length, location, and continuity of the interrogation; the

20   defendant's maturity, education, physical condition, and mental health; whether the defendant

21   was advised of his rights; and whether counsel was present); *Berghuis v. Thompkins*, 560 U.S.

22   370, 384 (2010) ("Where the prosecution shows that a *Miranda* warning was given and that it

23

was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.").

### 2.    State court determination

In affirming Marshall's judgment of conviction, the Nevada Court of Appeals held:

> Marshall argues his confession was involuntary because the detectives told him they wanted "to try and help [Defendant Marshall] out" and this was an express promise of future leniency that induced him to confess. Marshall also asserts his confession was involuntary because the detectives deceived him about the case against him and their investigation by telling him they had spoken with the victim, Saul, and the other guy. Finally, he asserts the following factors contribute to the involuntary nature of his confession: he had turned 18 only a couple of months before the incident; he had not yet graduated from high school; he had been held back a year during his schooling; he was under the influence of morphine and in the process of seeking medical treatment when he was questioned; he was not properly Mirandized prior to the interview; he was denied his ability to speak to counsel prior to the interview; the interview lasted over 50 minutes; he had a police hold placed on him; he was monitored and guarded by the police for three to four hours prior to the interview; and the questioning was repeated and prolonged in nature.
>
> "A confession is admissible only if it is made freely and voluntarily, without compulsion or inducement." *Passama v. State*, 103 Nev. 212, 213, 735 P.2d 321, 322 (1987). "Unlike the objective custody analysis, the voluntariness analysis involves a subjective element as it logically depends on the accused's characteristics" and it is the prosecution's burden to demonstrate, by a preponderance of the evidence, that a confession was voluntary. *Rosky*, 121 Nev. at 193, 111 P.3d at 696. A court must look at "the effect of the totality of the circumstances on the will of the defendant" when determining the voluntariness of a confession. *Passama*, 103 Nev. at 214, 735 P.2d at 323. "The question in each case is whether the defendant's will was overborne when he confessed." *Id*.
>
> Implicit and explicit promises that trick a defendant into a confession can render a confession involuntary. *See id*. at 215, 735 P.2d at 323; *see also Franklin v. State*, 96 Nev. 417, 421, 610 P.2d 732, 734-35 (1980). Although police deception is a relevant factor in determining whether a confession is voluntary, "an officer's lie about the strength of the evidence against the defendant is, in itself, insufficient to make the confession involuntary" and "confessions obtained through the use of subterfuge are not vitiated so long as the

methods used are not of a type reasonably likely to procure an untrue statement." *Sheriff, Washoe Cty. v. Bessey*, 112 Nev. 322, 324-25, 914 P.2d 618, 620-21 (1996).

At the evidentiary hearing on the motion to suppress, Detective Suranowitz testified that before the interview he was informed by a nurse that Marshall had half a dose of morphine, he was coherent and would be able to talk to them and understand everything. When the detectives entered the room, Marshall was awake and in a sitting position and, although he had medical devices hooked up to him, he was not strapped down. Detective Suranowitz testified Marshall was clear when he spoke, alert, and conversing like a normal person. Detective Suranowitz also testified regarding the room Marshall was in and said the door was not locked; Marshall could adjust the bed and call the nurse as needed; Marshall had a phone, water, and a restroom available to him; and there was a television in the room.

At the beginning of the first interview, the detectives introduced themselves to Marshall as detectives, explained they wanted to talk to Marshall to find out what happened, and said they wanted to "try and help [him] out." There is no indication that the detectives' statement they wanted to help Marshall out induced him to talk about the Nettleton shooting or that the statement was an implicit or explicit promise of leniency to Marshall in exchange for talking to them. Further, there is nothing in the record to indicate that Marshall perceived this statement as an offer of leniency.

Later during the interview, the detectives told Marshall he was free to terminate the questioning at any time, which he acknowledged he understood, and Marshall continued to talk to the detectives. Although the detectives deceived Marshall by telling him they had talked to Saul and others regarding the incident, the detectives never told Marshall what these other individuals had allegedly told them, nor did they provide him with facts regarding the Nettleton shooting. Subsequently, Marshall confessed to activities which implicated him in the Nettleton shooting and described for the detectives what occurred. The interview lasted approximately 50 minutes. At no time during the interview did Marshall indicate he did not want to talk to the detectives.

Detective Suranowitz further testified he was not aware an attorney had attempted to contact Marshall. And nothing in the record indicates that Marshall was aware counsel tried to contact him.

The district court agreed with the State's assertion that Marshall was lucid when he made his confession and denied the motion to suppress. The court's factual finding of lucidity is supported by the record and not clearly wrong. We conclude that when subjectively considering the totality of the circumstances in

this case the State met its burden and proved Marshall's confession was voluntary and his will was not overborne when he confessed.

> [FN4] Because we conclude Marshall's confession was voluntarily given and not the product of coercion, we need not address Marshall's claim that his second statement to the detectives should have been suppressed as fruit of the poisonous tree.

*See Passama*, 103 Nev. at 214, 735 P.2d at 323 (identifying factors to be considered when determining whether a defendant's confession was voluntarily given).

Although the detectives misrepresented the fact they had spoken with Saul and others about the case before talking to Marshall, the deception was a minor intrinsic one that under the totality of the circumstances was not reasonabl[y] likely to procure an untrue statement. *See Bessey*, 112 Nev. at 324, 914 P.2d at 619. Further, even assuming counsel was denied contact with Marshall, because nothing in the record indicates Marshall was aware counsel tried to contact him, such a denial would not have rendered his confession involuntary. *See Moran*, 475 U.S. at 422-24 (events occurring outside presence of suspect have no bearing on the suspect's ability to understand and knowingly waive a constitutional right, and although potentially unethical, the failure to inform a person that counsel is attempting to reach him "is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them"); *see also Goldstein v. State*, 89 Nev. 527, 529-30, 516 P.2d 111, 112-13 (1973).

Because Marshall was not in custody for *Miranda* purposes during his first interview with the detectives and because we conclude his confession was voluntary and not the product of coercion, we further conclude the district court did not err by denying Marshall's motion to suppress.

ECF No. 49-9 at 8–12.

**3.    Analysis**

The Nevada Court of Appeals reasonably determined that Marshall's confession was voluntary.  The closest on-point Supreme Court case about being interrogated in a hospital room

18

while receiving medical treatment, *Mincey v. Arizona*, 437 U.S. 385 (1978), is distinguishable. In *Mincey*, a police officer interviewed the defendant while he was hospitalized. *Id.* at 396. Mincey, who was "encumbered by tubes, needles, and [a] breathing apparatus," could only answer questions by writing his answers down. *Id.* at 396, 399.  Mincey repeatedly asked the officer to stop interrogating him until he could get counsel, but the officer continued interrogating him for hours. *Id.* at 396, 399–400.  Mincey was in unbearable pain, his responses to many questions were incoherent, and he repeatedly lost consciousness during the interview. *Id.* at 398–401.  The Supreme Court determined that Mincey's statements were involuntary because they "were not 'the product of his free and rational choice.'" *Id.* at 401. Contrarily, here Marshall's first interview with detectives lasted less than an hour, he did not ask the officers to leave, and he was coherent.

Regarding the other circumstances surrounding the voluntariness of the interrogation, Marshall urges consideration of the following facts: (1) the detectives promised him future leniency, (2) there were coercive actions taken by law enforcement in the form of the detectives lying about having spoken to Williams and in the high level of police activity surrounding the interrogation, including, *inter alia*, the police blocking his family and friends from seeing him and denying him the ability to speak to his counsel, and (3) his personal attributes, including his young age, mindset, and education, made him susceptible to coercion. The Nevada Court of Appeals appears to have reasonably considered each of these circumstances in conducting a totality-of-the-circumstances, subjective inquiry determining whether Marshall's confession was voluntary.

First, regarding the detectives' alleged improper inducement, when they first introduced themselves to Marshall, Detective Antoniewicz stated, "we're just coming out here to talk to you

and find out what happened, okay? We want to try and help you out, all right?" ECF No. 17-1 at 48.  As the Nevada Court of Appeals reasonably determined, this statement did not amount to an implicit or explicit promise of leniency to Marshall in exchange for talking to them.  Rather, this statement was made by way of an introduction and to let Marshall know the purpose of the detectives' visit: assisting Marshall as a victim of a crime.

Second, regarding the detectives' alleged psychological coercion, during the detectives' first interview, one of the detectives stated, "we talked to [Williams who] gave us his version of what happened. We know everything that happened.  We know [Williams's] version of everything that happened. . . . [T]he reason we're down here is to get your version of what happened." ECF No. 17-1 at 50.  As the Nevada Court of Appeals reasonably determined, this statement, while undeniably false, was minor.  The detectives did not threaten or pressure Marshall to give a confession; they merely stated that Williams had told them his side of the story and asked Marshall for his version of events.  This form of psychological persuasion was subtle and minimal. *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (where the pre-confession "questioning was of short duration" and the accused is a "mature individual of normal intelligence," even subtle forms of police coercion such as misrepresenting evidence are "insufficient in our view to make this otherwise voluntary confession inadmissible"); *see also United States v. Crawford*, 372 F.3d 1048, 1060–61 (9th Cir. 2004) (explaining that "[t]rickery, deceit, even impersonation do not render a confession inadmissible, certainly in noncustodial situations and usually in custodial ones as well, unless government agents make threats or promises" (internal quotation marks omitted)).  And regarding the detectives denying Marshall outside contact, the Nevada Court of Appeals reasonably noted that the record belied such an argument, noting that the detectives were not aware that an attorney had attempted to contact

1    Marshall.  Further, Detective Suranowitz testified that there was no police hold on Marshall

2    restricting his friends and family from visiting his hospital room until after the second interview.

3    Third, regarding Marshall's personal attributes, the Supreme Court has recognized that a

4    suspect's "mental condition is surely relevant to an individual's susceptibility to police

5    coercion." *Colorado v. Connelly*, 479 U.S. 157, 165 (1986).  The Nevada Court of Appeals

6    reasonably noted that Marshall had just recently turned 18 years old at the time of the interview,

7    he had not yet graduated from high school, and he had been held back a year during his

8    schooling.  These facts support a finding that Marshall, a young man who was being interviewed

9    by detectives in an unfamiliar hospital room apart from his family and friends, was susceptible to

10   coercion.

11   But having assessed these various circumstances, the Nevada Court of Appeals concluded

12   that the totality of the circumstances, when considered subjectively, showed that Marshall's

13   confession was voluntary.  This conclusion was reasonable.  Although Marshall was susceptible

14   to coercion, any coercion by the detectives was minimal.  As such, after evaluating the

15   detective's nominal pressure against Marshall's power of resistance, the Nevada Court of

16   Appeals reasonably determined that Marshall's will was not overborne.

17   Accordingly, the Nevada Court of Appeals' affirmation of the trial court's denial of

18   Marshall's suppression motion regarding the voluntariness of his confession was neither contrary

19   to, nor an unreasonable application of, clearly established federal law and was not based on an

20   unreasonable determination of the facts.  Marshall is not entitled to federal habeas relief for

21   ground 2.

22   / / / /

23   / / / /

### C. Ground 3(a)—counsel's effectiveness in Marshall's suppression motion

Marshall alleges that his counsel was ineffective for not arguing the principles recognized in *Missouri v. Seibert* within his motion to suppress. ECF No. 17 at 39. In *Missouri v. Seibert*, the Supreme Court of the United States held that a "midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda*'s constitutional requirement," so "a statement repeated after a warning in such circumstances is inadmissible." 542 U.S. 600, 604 (2004); *see also Reyes v. Lewis*, 833 F.3d 1001, 1029 (9th Cir. 2016) ("[I]f officers deliberately employ the two-step technique employed in *Seibert*, and if insufficient curative measures are taken to ensure that later *Miranda* warnings are genuinely understood, any warned statement thereby obtained must be suppressed, even if the statement is voluntary.").

### 1. Legal standard

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some

1   conceivable effect on the outcome of the proceeding." *Id*. at 693.  Rather, the errors must be "so

2   serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

3        Where a state court previously adjudicated the claim of ineffective assistance of counsel

4   under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See*

5   *Richter*, 562 U.S. at 104–05.  In *Richter*, the Supreme Court clarified that *Strickland* and §

6   2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *Id*.

7   at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation

8   marks omitted) ("When a federal court reviews a state court's Strickland determination under

9   AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's

10  description of the standard as doubly deferential.").  The Supreme Court further clarified that,

11  "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The

12  question is whether there is any reasonable argument that counsel satisfied *Strickland*'s

13  deferential standard." *Richter*, 562 U.S. at 105.

14       **2.    State court determination**

15       In affirming the state court's denial of Marshall's state habeas petition, the Nevada Court

16  of Appeals held:

17            Marshall argues the district court erred by denying his claim
          of ineffective assistance of trial-level counsel without conducting an
18        evidentiary hearing. . . .  We give deference to the court's factual
          findings if supported by substantial evidence and not clearly
19        erroneous but review the court's application of the law to those facts
          de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166
20        (2005). To warrant an evidentiary hearing, a petitioner must raise
          claims supported by specific factual allegations that are not belied
21        by the record and, if true, would entitle him to relief. *Hargrove v.
          State*, 100 Nev. 498, 502-03, 686 P.2d 222, 225 (1984).
22            Marshall claimed counsel was ineffective for failing to
          challenge the admissibility of confessions Marshall made both
23        before and after he was advised of his rights pursuant to *Miranda v.
          Arizona*, 384 U.S. 436 (1966).   While acknowledging counsel

> moved to suppress Marshall's unMirandized confession, Marshall
> claimed that, had counsel argued for suppression pursuant to
> *Missouri v. Seibert*, 542 U.S. 600 (2004), both the unMirandized and
> subsequent Mirandized confessions would have been suppressed
> and he would have proceeded to trial instead of pleading guilty.
> . . . .
> Here, this court has already concluded that Marshall's
> unMirandized confession would have been admissible at trial.
> *Marshall v. State*, Docket No. 68747-COA (Order of Affirmance,
> March 29, 2017). This holding represents the law of the case, *Hall
> v. State*, 91 Nev. 314, 315-16, 535 P.2d 797, 798-99 (1975), and
> Marshall did not claim an exception to this doctrine, *see Tien Fu
> Hsu v. Cty. of Clark*, 123 Nev. 625, 630-31, 173 P.3d 724, 728-29
> (2007). Because Marshall's unMirandized confession would have
> been admissible at his trial, Marshall failed to demonstrate that
> *Seibert* applied to his case. In turn, he failed to demonstrate counsel
> was deficient or a reasonable probability that he would not have
> pleaded guilty and would have insisted on going to trial had counsel
> sought suppression of his confessions pursuant to *Seibert*.
> Therefore, we conclude the district court did not err by denying this
> claim without conducting an evidentiary hearing[.]

ECF No. 51-8 at 2–4.

### 3.    Analysis

The Nevada Court of Appeals reasonably determined that Marshall failed to demonstrate

prejudice under *Strickland*. *Seibert* applies to situations in which law enforcement officers

deliberately fail to give timely required *Miranda* warnings, waiting instead until after they get a

confession to give *Miranda* warnings and then attempting to get a repeat confession. As the

Nevada Court of Appeals reasonably concluded, *Seibert* is inapplicable to the facts of Marshall's

case. Indeed, as was discussed in ground 1, the trial court reasonably determined that Marshall

was not in custody during his first interview with detectives, so the detectives were not required

to give Marshall a *Miranda* warning at that time. As such, even if counsel had argued the

principles under *Seibert*, such an argument would not have been fruitful. *See Kimmelman v.*

*Morrison,* 477 U.S. 365, 375 (1986) (explaining that in alleging that counsel failed to file a

1  pretrial motion to suppress evidence, the petitioner must establish, in part, a reasonable

2  probability that the evidence would have been suppressed).

3      Marshall fails to establish a reasonable probability that his first interview with detectives

4  would have been suppressed had his counsel argued the principles of *Seibert* within his motion to

5  suppress.  Thus, the Nevada Court of Appeals' determination that the trial court did not err in

6  denying Marshall's claim constitutes an objectively reasonable application of *Strickland*'s

7  prejudice prong and was not based on an unreasonable determination of the facts.  Marshall is

8  not entitled to federal habeas relief for ground 3(a).

9  **IV.  CERTIFICATE OF APPEALABILITY**

10     This is a final order adverse to Marshall.  Rule 11 of the Rules Governing Section 2254

11  Cases requires this court to issue or deny a certificate of appealability (COA).  I have *sua sponte*

12  evaluated the claims within the amended petition for suitability for the issuance of a COA. *See*

13  28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002).  A COA may

14  issue only when the petitioner "has made a substantial showing of the denial of a constitutional

15  right." 28 U.S.C. § 2253(c)(2).  With respect to claims rejected on the merits, a petitioner "must

16  demonstrate that reasonable jurists would find the district court's assessment of the constitutional

17  claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v.*

18  *Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  Applying these standards, a certificate of appealability

19  is warranted for count 2.  Reasonable jurists could debate whether the Nevada Court of Appeals

20  reasonably determined that Marshall's confession was voluntary.  Reasonable jurists could

21  debate whether the totality of the following circumstances, when considered subjectively,

22  showed that Marshall's will was overborne: (1) the detectives engaged in significant

23  psychological coercion by misrepresenting evidence, and (2) Marshall was exceedingly

susceptible to coercion given his young age, immaturity, and questionable mental condition given his medical ailments.  A COA is not warranted for the remainder of Marshall's grounds.

**V.      CONCLUSION**

I THEREFORE ORDER that the amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 **[ECF No. 17] is denied**.

I FURTHER ORDER that a **certificate of appealability is granted as to count 2 only**.

I FURTHER ORDER that the Clerk of Court (1) substitute Brian Williams for respondent Calvin Johnson, (2) enter judgment accordingly, and (3) close this case.

Dated: September 26, 2023.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE